IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANAYELL NIETO ROJAS<br><br>Defendant. | CRIM. No. 09-0154-E-BLW<br><br>MEMORANDUM DECISION<br>AND ORDER |

## INTRODUCTION

The Court has before it a motion to suppress. The Court heard evidence on November 20th and 25th, 2009, and allowed further briefing that was received on November 30, 2009, and December 1, 2009. For the reasons expressed below, the Court will grant the motion as to defendant's statements during the station-house interrogation but deny the motion in all other regards.

## FACTUAL BACKGROUND

On May 27, 2009, Trooper Rindlisbacher of the Utah Highway Patrol stopped a Chrysler 300 vehicle driven by defendant Rojas. Rindlisbacher walked

up to the vehicle and told Rojas that he had stopped her because her window tint appeared to be too dark. But that was not the only reason he stopped her. Earlier, Idaho officers had been following the Chrysler 300, and once it entered Utah, the Idaho officers notified Utah police that they should stop the car if they had an independent basis for doing so.

The Idaho officers had been monitoring a controlled drug buy in Idaho. On that same day, Idaho officers purchased drugs from co-defendant Galvan-Reyes in Franklin County, Idaho. Galvan-Reyes was paid $5,200 in pre-recorded bills. After the deal, the officers followed Galvan-Reyes to Preston, Idaho where he stopped and met with three persons in a green Chrysler 300.

The Idaho officers then followed the Chrysler 300 as it left, heading south into Utah. Once it crossed the state line, they contacted the Utah police explaining the situation and asking them to pull the car over if they had an independent basis for doing so.

After Rindlisbacher pulled the Chrysler 300 over and told Rojas that he had done so due to her dark window tint, he demanded identification from Rojas. She turned over the registration but told the officer that she did not have a valid license. The car also included two passengers, neither of whom had a valid license.

As he stood by the driver's window asking for identification, Rindlisbacher

could clearly see a carton of beer in the car. He asked where they bought the beer and they responded that it was purchased in Idaho. Transporting beer over state lines is a violation of law, and Rindlisbacher so informed Rojas. Rindlisbacher then used his tint meter to find that the window tinting was in excess of legal limits.

When asked about the ownership of the car, Rojas claimed to have borrowed it from a friend named Jose who lived in Salt Lake City, Utah. However, Rindlisbacher discovered that the registered owner was Maria Perez from Idaho Falls, Idaho.

Because there was no licensed driver at the scene, and the owner of the vehicle was not present, Rindlisbacher contacted dispatch to arrange for the car to be towed. He also requested that a canine officer respond to the scene.

He asked Rojas to exit the car, and he directed her to the rear of the car due to the high-speed traffic passing very close to the driver's side of the car. He handed Rojas three citations for (1) driving without a valid license, (2) transporting beer across state lines, and (3) driving a vehicle with excessive window tinting. He explained the citations to her and informed her that they would have to take her car, and that she could call a friend to get a ride home. This entire conversation was in English.

Rojas understood, and made a cell phone call to get a ride. She completed her call and informed the Trooper that her ride was on its way. He responded that she should "take a seat" in the car and wait for her ride "and then we'll let you go and we'll take the car." Rojas returned to the car. During this entire conversation, the Trooper was speaking English and Rojas was able to converse with him, demonstrating that she understood the English language.

As the car's occupants were waiting in their vehicle for their ride, Trooper Rindlisbacher decided to do an inventory search of the car before it was towed away. The officers motioned for the car's occupants to exit the vehicle. As Rojas exited the car, the Trooper asked Rojas to "pop the trunk" and then asked her to "stand over here," motioning by the rear of the car. The Trooper did not physically touch her in any way, but simply motioned her to the rear of the car. Once again, Rojas was dangerously close to passing traffic, and the Trooper's direction to her was for her safety and his own. This was the same area where Rojas had stood previously as he cited her.

Rojas testified at the hearing that at this point, she felt like she was in custody and not free to leave. The three waited at the rear of the car as the Trooper began an inventory search of the car prior to its impoundment. An officer off-screen apparently directed the two males to go sit on the curb. For a short time

Rojas is standing alone behind the car. She testified that an off-screen officer motioned, but did not verbally direct her, to sit on the curb with the males, and she did so. As a third officer arrives, another officer points at the three on the curb and says, in a loud voice to be heard over the roar of the traffic, "watch these guys, Johnny." This statement, Trooper Rindlisbacher testified, was spoken loud enough for Rojas to hear as she was seated on the curb.

At this point it appears that the three had moved off the curb but were standing nearby, although off-camera. Trooper Rindlisbacher can be seen for a moment, and then moves a very short distance off-camera, where he can be heard conversing with Rojas about the ownership of the car in English. He finds out from her that a person named "Maria" owns the car, and that a different person, "Jose," let Rojas borrow the car. During this conversation, Rojas displays an understanding of English.

At the end of that conversation, Trooper Rindlisbacher tells the three to "come back here and wait for your ride – come back here – grab your drink – why don't you sit on the curb here." Once again, the Trooper is obviously directing the three for their own safety due to the proximity of traffic.

At this point, the canine officer deployed his drug dog. The dog immediately alerted on the interior of the car.

After observing this, Trooper Rindlisbacher asked one of the male passengers for consent to search his person. Consent was granted and the individual was searched, but nothing was found.

Trooper Rindlisbacher then brought Rojas over to the car and told her that the drug dog "says" that drugs are in the car. As he and Rojas looked into the car, the following exchange took place:[1]

| | |
|---|---|
| Trooper | Did the people in the car have drugs? |
| Rojas | I don't know. |
| Trooper | You don't know? |
| Rojas | No. |
| Trooper | You don't know? You don't have drugs on you? |
| Rojas | No. |
| Trooper | Do you care if I look? Do you have anything in your pockets or purse? Do you care if I look? |
| Rojas | No. |
| Trooper | Do you understand? |

---

[1] The Court prepared a rough transcript prior to the hearing, and Trooper Rindlisbacher was provided with that transcript as he testified at the hearing. During his testimony, he corrected portions of that transcript. *See Exhibit A*. The Court finds his testimony credible, and so the account of the conversation set forth above contains his corrections. The defense did not dispute the accuracy of that corrected transcript either during or after the hearing.

**Memorandum Decision & Order – page 6**

| | |
|---|---|
| Rojas | No - I don't know |
| Trooper | Huh? |
| Rojas | I don't know [unintelligible] |
| Trooper | You spoke English fine before. |
| Trooper | Do you care if I look in your purse and in your pockets? |
| Rojas | Okay |
| Trooper | You understand? |
| Rojas | [pause] Okay |
| Trooper | Its okay?  You understand? |
| Rojas | Hm Hmm [meaning okay] |
| Trooper | Okay, pull your pockets inside out.  Pull your pockets.  Pull them out. |
| Trooper | Open your purse for me. |

The Trooper took the purse and started searched it.  As he was looking through the purse, with Rojas standing next to him, she informs him that her ride has arrived.  As he continues to search, he asks her if she wants him to talk to them.  At this point, the Trooper discovers the gun in the purse and puts handcuffs on Rojas.  He also found more than $2000 in currency, which consisted some of the pre-recorded bills from the previous drug transaction.

Rojas was asked at the hearing whether she understood that she could deny

**Memorandum Decision & Order – page 7**

the Trooper's request to search her purse. She responded, "Yes, but -- yes, but they were on top of me and well, I had to do it." She testified that she felt that she was in custody and compelled to allow the search because (1) two officers were standing near her, (2) the Trooper was using an authoritarian tone of voice, (3) the officers had searched her car, and (4) the Trooper had made one of the males drop his pants to search him.

Later, at the Logan Police Department, Rojas was brought into an interview room. Rojas was then interrogated by Trooper Rindlisbacher with Detective Paul Olsen, who spoke Spanish, acting as an interpreter. The Court viewed a video of this interrogation.

Detective Olsen testified at the hearing. In addition, a transcript of the conversation in Spanish, along with its English translation, was prepared and stipulated as accurate by counsel. *See Exhibit B.* That transcript shows that Detective Olsen informed Rojas (1) of her right to remain silent, (2) of her right to an attorney, (3) that an attorney would be appointed for her if she could not afford one, and (4) that she should not lie to the officers. Detective Olsen does not state on the transcript – nor did he state in his testimony – that he informed Rojas that anything she says can be used against her in a court of law. From the video of the interrogation, it is apparent that Detective Olsen was reciting the *Miranda* rights

**Memorandum Decision & Order – page 8**

from memory rather than from a pre-printed card.

After being informed of these rights, Rojas said nothing.  Detective Olsen then began to ask her questions, and she responded.  While she answered some questions, she refused to answer others, and Detective Olsen did not pursue those questions.

## ANALYSIS

**1.     Vehicle Stop**

The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.  *Whren v. United States*, 517 U.S. 806 (1996).  The fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop.  *U.S. v. Wallace*, 213 F.3d 1216, 1217-21 (9th Cir. 2000).

While the Government concedes that Trooper Rindlisbacher's stop of the car was pretextual, the fact remains that he had an independent reason for stopping the car because its window tint was too dark.  Thus the stop of the car was proper.

Given that the stop was proper, Trooper Rindlisbacher did not violate the Fourth Amendment by conducting a license and registration check.  *See U.S. v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001), *amended* 279 F.3d 1062 9th Cir. 2002).  Thus, he properly discovered that none of the occupants in the

**Memorandum Decision & Order – page 9**

vehicle owned the car or had a valid driver's license.

## Inventory Search

Police have the authority to conduct an inventory search of a car when that search is exercised "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Colorado v. Bertine*, 479 U.S. 367, 375 (1987). Here, none of the occupants could legally drive the vehicle, forcing Trooper Rindlisbacher to impound the vehicle, at which time he conducted an inventory search pursuant to standard criteria. The Court can find no flaw in the inventory search. *See U.S. v. Wanless*, 882 F.2d 1459, 1463 (9th Cir.1989) (stating "it is undisputed that once a vehicle has been impounded, the police may conduct an inventory search"). Calling the drug dog to check the car during the inventory search is proper. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (holding that a "dog sniff performed during a traffic stop [for speeding] does not violate the Fourth Amendment").

## Search of Rojas's Purse

The Court finds that Rojas consented to the search of her purse. Rojas testified that she understood the Trooper's request to search her purse, and the video of the encounter shows she was proficient enough in English to converse with the Trooper throughout the encounter. For example, when the Trooper

**Memorandum Decision & Order – page 10**

explained that he was going to impound the car and that she would need to get a ride, she understood his English and made a cell phone call to obtain a ride. After completing the call, she explained to the Trooper – in English – about her situation. Moreover, she was able to explain in English the complicated situation regarding the ownership and lending of the car.

Thus, when the Trooper asked Rojas to search her purse, she understood the question. She argues, however, that she did not feel she could object to the search of her purse because she was in custody at this point.

A warrantless search is unconstitutional unless the government demonstrates that it "fall[s] within certain established and well-defined exceptions to the warrant clause." *U.S. v. Murphy*, 516 F.3d 1117, 1120 (9th Cir.2008). Consent constitutes one such exception: "[A warrantless] search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The government bears the burden of proving that consent was voluntary. *U.S. v. Brown*, 563 F.3d 410 (9th Cir. 2009). Whether consent to search was voluntarily given is "to be determined from the totality of all the circumstances." *Id.*

The Ninth Circuit considers five factors in determining voluntariness: (1) whether the consenting individual was in custody; (2) whether the arresting

**Memorandum Decision & Order – page 11**

officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the consenting individual was notified that she had a right not to consent; and (5) whether the consenting individual had been told a search warrant could be obtained.  *Id.*

With respect to the first factor, Rojas would be in custody when "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that she was not at liberty to ignore the police presence and go about her business."  *Id.*  The Ninth Circuit has identified five factors that aid in determining whether a person's liberty has been so restrained:  (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter.  *Id.*

The defense argues that "clearly this was more than just a casual police encounter."  *See Rojas Reply Brief* at p. 2.  The Court agrees.  When Rojas consented to the search of her purse there were two officers standing next to her, a third officer nearby, and a fourth officer with a drug dog on the scene.  By this time, the officers had searched the car, deployed the drug dog, and done a consent

search of the person of one of the male occupants of the car. Moreover, one officer had asked another to "watch these guys" in a voice loud enough to be heard by Rojas during the time she was seated with the males on the curb. The presence of the officers is a factor weighing in favor of a finding that Rojas was in custody.

There are, however, substantial contrary factors. The officers demeanor toward Rojas was, for most of the encounter, deferential and protective rather than commanding. It is apparent from the video that the officers directed Rojas to certain locations to protect her from nearby high-speed traffic rather than to detain her or physically control her. When asking to search her purse, the officers made a request rather than a demand. When she said "ok", the Trooper asked twice whether she understood and got two affirmative responses.

The defendant argues that the "language barrier" contributed to Rojas's sense that she was in custody. *See Rojas Reply Brief* at p. 6. The Court disagrees. Given Rojas's understanding of English, as discussed above, there was no language barrier that would lead her to reasonably believe that she was in custody.

Critical to the custody analysis, the Trooper had told Rojas multiple times that she was free to go when her ride arrived. If the ride had arrived immediately, Rojas would have been free to go and her purse would have never been searched. When Rojas did notify the Trooper of the ride's arrival, the only reason that she

did not immediately leave is that the Trooper was in the middle of searching her purse, and within seconds found the gun that led to her arrest.

Finally, the officers never displayed their weapons, did not physically control Rojas at any point, and carried out the traffic stop entirely in a public area.

Taking into account all the circumstances, a reasonable person in Rojas's position would have believed that she was free to go about her business. Therefore, the Court finds that Rojas was not in custody, and could not reasonably have perceived otherwise.

Of the four remaining factors to be considered in determining the validity of Rojas's consent, three weigh in favor of a finding of voluntariness: (1) the officers had not drawn their guns;(2) no Miranda warnings were given; and (3) the officers did not try to mislead Rojas by suggesting they could obtain a search warrant if she did not consent to the search. The only factor which suggests a lack of voluntariness was the officer's failure to advise Rojas that she had a right not to consent. Although this factor may be critical in a close case, the Court is not inclined to perceive it as determinative here. In conclusion, the Court finds that the Government has carried its heavy burden of showing that Rojas voluntarily consented to the search of her purse.

**Station-House Interrogation**

In *Miranda v. Arizona,* 384 U.S. 436, 478-79 (1966), the Supreme Court established the rule that during a custodial interrogation, an accused

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

The prophylactic *Miranda* warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker*, 417 U.S. 433, 444 (1974). Reviewing courts therefore need not examine Miranda warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by Miranda." *Duckworth v. Egan*, 492 U.S. 195, 202-3 (1988).

While specific words are not required, the complete failure to advise a defendant of a critical right violates *Miranda. See U.S. v. Perez-Lopez*, 348 F.3d 839 (9th Cir. 2003) (failure to advise defendant that attorney would be appointed if he could not afford one was *Miranda* violation). In this case, Detective Olsen completely failed to advise Rojas that anything she said could be used against her. A similar situation was faced in *U.S. v. Tillman*, 963 F.2d 137 (6th Cir. 1992), and

**Memorandum Decision & Order – page 15**

the Court commented upon the importance of this particular aspect of *Miranda:*

> Of all of the elements provided for in *Miranda*, this element [ the right to be advised that anything you say may be used against you] is perhaps the most critical because it lies at the heart of the need to protect a citizen's Fifth Amendment rights. The underlying rationale for the *Miranda* warnings is to protect people from being coerced or forced into making self-incriminating statements by the government. By omitting this essential element from the *Miranda* warnings a person may not realize why the right to remain silent is so critical . . . . This is a dangerous omission because a person under arrest would feel more compelled to answer questions of police officers.

*Id*. at 141. The Court agrees with this analysis. To guard against this very omission, the Ninth Circuit has "encouraged" officers to "read the defendant his rights from a prepared card." *See U.S. v. Noti*, 731 F.2d 610, 615 (9th Cir. 1984).

Because Rojas was never advised that anything she said could be used against her, her statements during the subsequent interrogation cannot be used against her. The motion to suppress will be granted to that extent.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to suppress (docket no. 33) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it seeks to exclude any statements by defendant Rojas at the Logan Police Station interview by Trooper Rindlisbacher and Detective Olsen. It is denied in all other respects.

**Memorandum Decision & Order – page 16**



DATED: **December 2, 2009**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order – page 17**